IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

DONALD R. BERRY,                        )
                                        )
Plaintiff,                              )
                                        )
v.                                      )
                                        )          Case No.  1:12-CV-6 RWS/SPM
                                        )
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
Defendant.                              )

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Michael J. Astrue, the Commissioner of Social Security, denying the applications of

Plaintiff Donald Berry for disability insurance benefits under Title II of the Social Security Act,

42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income (SSI) under Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act").  This matter was referred to the

undersigned United States Magistrate Judge for review and a recommended disposition pursuant

to 28 U.S.C. § 636(b).  The undersigned recommends that the decision of the Commissioner be

affirmed.

## I.     PROCEDURAL HISTORY

Plaintiff filed his applications for benefits under Titles II and XVI of the Act on

September 12, 2008, claiming disability because of back problems, anxiety disorder, and bipolar

disorder, with an onset date of February 15, 2007.  (Tr. 172-78, 211).  Plaintiff's applications

were denied initially on December 11, 2008. (Tr. 105-09). A hearing was held before Joseph L. Heimann, an Administrative Law Judge ("ALJ") on June 23, 2010. (Tr. 26-87). Following the hearing, on September 24, 2010, the ALJ found that Plaintiff was not under a "disability" as defined in the Act. (Tr. 9-20). On November 10, 2011, the Appeals Council of the Social Security Administration denied Plaintiff's request for review. (Tr. 2-4). Thus, the ALJ's decision stands as the final decision of the Commissioner.

In appealing the Commissioner's decision, Plaintiff argues (1) that the ALJ erred at step two by failing to find that Plaintiff's anxiety was a severe impairment, and (2) that the ALJ's residual functional capacity assessment did not include adequate limitations related to Plaintiff's severe mental and physical impairments.

## II.  FACTUAL BACKGROUND

### A.  PLAINTIFF'S TESTIMONY

Plaintiff testified to the following at the hearing before the ALJ. Plaintiff was born on March 31, 1966. (Tr. 37). He lives with his 72-year-old father, his sister, and his twin nieces. (Tr. 54-55). He completed the tenth grade and obtained his GED. (Tr. 37). He has had no vocational training or military service. (Tr. 38-39). He is comfortable reading and writing. (Tr. 38). He had learning disabilities in second grade, but not later. (Tr. 38).

Plaintiff's most recent job was with Knuckles Brothers Construction, where he worked for four months, into 2007. (Tr. 41-43, 45). He did carpentry and tile work. (Tr. 44-45). Prior to that job, in 2005 and 2006, he worked on a factory assembly line at Nordyne, screwing in parts. (Tr. 40, 45). Depending on where he was in the line; he might be standing or sitting; the positions rotated every hour. (Tr. 40-41). He was fired because he had a urinalysis that was

positive for hydrocodone, a medication he was taking for his back but that he was not supposed to take on the job. (Tr. 41, 71).

Plaintiff testified that his mental health is worse than his physical health. (Tr. 49). He has "panic anxiety" and bipolar disorder, and there are "voices" that come on more stressful days. (Tr. 53). Plaintiff gets physically sick if he goes to a large store with people coming and going all over the place. (Tr. 56). He sweats and panics and sometimes needs to go to the men's room. (Tr. 56-57). When he was working at the factory, he worked in the "back part" with about twelve people and did not have to go to the large factory floor. (Tr. 58).

At the time of the hearing, Plaintiff had been seeing a psychologist, Dr. John Wood, once a month for an hour. (Tr. 49-50). Plaintiff had previously seen Dr. Wood in 2006 or 2007 but had stopped seeing him for financial reasons; he returned to Dr. Wood when he got Medicaid. (Tr. 50-51). Dr. Wood consults with Plaintiff's general practitioner about what medications Plaintiff should be prescribed. (Tr. 51-52). Plaintiff takes trazodone,[1] Lamictal,[2] and Zoloft[3] for bipolar disorder. He has been on trazodone for a long time, on Lamictal five months, and on Zoloft for a month. (Tr. 74). Plaintiff's mental health medication helps, but not all the time. (Tr. 57). It will work for a little bit and then the medication will be changed, and it "screws you all up again." (Tr. 58).

In addition to his mental impairments, Plaintiff has constant pain in the small of his back and in his groin area, and it radiates down his legs on occasion. (Tr. 72). He takes hydrocodone

---

[1] Trazodone is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html#why
[2] Lamictal is a brand name for lamotrigine and is used to treat seizures and bipolar disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html
[3] Zoloft is a brand name for sertraline, which is used to treat depression, obsessive-compulsive disorder, panic attacks, and social anxiety disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html

three times a day for pain and feels pain even when he takes it. (Tr. 62, 72). On medication, his pain is about a seven on a scale of one to ten; without medication, it is a nine. (Tr. 72-73). Switching positions can make his pain lighten up but only for a few moments. (Tr. 73). He had an MRI that showed three bulging discs. (Tr. 65). His treatment providers have discussed surgery and injections as options. (Tr. 66). Plaintiff went through physical therapy in May and June of 2006 and did some of the exercises they gave him for a while; he no longer does them because his back hurts too much. (Tr. 66-67).

Plaintiff cannot stand for more than 15 to 20 minutes at a time and 30 to 45 minutes in an entire day because his back hurts. (Tr. 61-63). He can walk about a block at a time. (Tr. 63). He can lift about 15 or 20 pounds and maybe 30 pounds occasionally. (Tr. 67). In 2007, he could walk a mile, but by 2008, he was limited to 100 yards, and by 2010, he could walk a small block. (Tr. 63-64). He can sit for about 30 to 45 minutes before having to stand up. On the hour and a half-long car trip to the hearing, he lay back in the seats. (Tr. 68). His hands fall asleep if they are "above like this," but this does not cause him to drop things. (Tr. 69).

During the day, Plaintiff mostly lies down and watches television and reads. (Tr. 69-70). There is no way he can get completely comfortable. He used to be an amateur astronomer but no longer does it because he cannot stand, his eyes are getting worse, and he can no longer do the math. (Tr. 70). Plaintiff does not clean the house, cook dinner, or take care of the yard. (Tr. 54-55). He does not go to his nieces' school plays or other activities because he thinks the anxiety would be too much. (Tr. 59). Plaintiff has no driver's license because of child support issues. (Tr. 71).

Plaintiff has filed several prior disability claims. His last claim was filed in 2003 and denied in 2004, and after the denial he earned $4700 in 2005 and almost $16,000 in 2006. (Tr. 39).

## B. MEDICAL TREATMENT[4]

Medical records from 1999 through Plaintiff's alleged disability onset date of February 15, 2007 show that Plaintiff has a history of mental impairments, including anxiety, panic attacks, depression, ADHD, bipolar disorder, and seizures, and that his mental impairments have been treated at various times with numerous medications. (Tr. 301, 325-336, 339-44, 349-51, 352-58, 366-71, 373-74, 385, 403-05, 416-17, 421, 425, 479, 481, 483-84, 542, 553). Plaintiff also has a history of numbness, tingling, and pain in his left hand. (Tr. 414-15). He also presented to his doctors with low back pain on several occasions in 2006 and was prescribed several pain medications. (Tr. 429-32, 447, 486, 489, 497, 571-583). He had some physical therapy in 2006 related to his back pain. (Tr. 491-93, 561-63, 566, 568-69).

On February 16, 2007, Plaintiff went to see L.J. Plunkett, M.D., and reported that he had been feeling "dizzy." (Tr. 428). It was noted that Plaintiff had panic attacks. (Tr. 446). Notes state that he was "staggering around" and that his boss made him take a drug screen, which was normal. (Tr. 428). It was noted that his moods were stable on his current regimen but that he wanted to switch to Ativan[5] instead of Klonopin.[6] He was diagnosed with bipolar disorder, rule out ADD. (Tr. 446).

---

[4] The following is not intended to be an exhaustive summary of the record. The summary below focuses, as do the parties' briefs, on the most relevant medical records during Plaintiff's alleged period of disability.

[5] Ativan is a brand name for lorazepam and is used to relieve anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682053.html

[6] Klonopin is a brand name for clonazepam and is used to control seizures and relieve panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html

During 2007 and 2008, Plaintiff returned to Dr. Plunkett on numerous occasions with reports of low back and hip pain, anxiety, and bipolar disorder and requesting refills and modifications of his various medications, including Cymbalta,[7] Klonopin, Ativan, trazodone, Tegretol,[8] Lorcet,[9] and Soma.[10]   (Tr. 427, 435, 445, 504, 507, 509-11, 519, 589-90).

On February 4, 2009, Plaintiff returned to Dr. Plunkett.  It was noted that he continued to have some problems sleeping, that his bipolar disorder "seems to be under fair control," and that he was having a lot of low back pain.  Lorcet was prescribed.  (Tr. 512).  On March 2, 2009, Plaintiff returned to Dr. Plunkett to have forms filled out for his disability claim.  His Klonopin and hydrocodone prescriptions were continued.  (Tr. 513).

On March 27, 2009, Plaintiff saw Ravdeep Khanuja, M.D.  (Tr. 407-09).[11]  He reported "feeling somewhat down," but his affect was incongruent to his stated mood.  He was casual, appropriate, and in no obvious distress.  He had a fair range of affect, a linear thought process, and no flight of ideas or tangentiality.  He reported a history of hip pain.  He was on hydrocodone, Soma, Klonopin, and trazodone.  Dr. Khanjua diagnosed Mood Disorder, NOS; "Consider Malingering Disorder" and noted hip problems.  (Tr. 408).  He assessed a GAF of 60. He gave Plaintiff Seroquel[12] and recommended that he decrease his Klonopin intake.  He noted

---

[7] Cymbalta is a brand name for duloxetine and is used to treat depression and generalized anxiety disorder.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html
[8] Tegretol is a brand name for carbamazepine and is used to control seizures.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682237.html
[9] Lorcet is a combination of hydrocodone, a narcotic, and acetaminophen.
http://www.nlm.nih.gov/medlineplus/ency/article/002670.htm
[10] Soma is a brand name for carisoprodol and is a muscle relaxant used to relive pain and discomfort caused by muscle injuries.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682578.html
[11] The first page of the record of this visit appears to be missing.
[12] Seroquel is a brand name for quetiapine and is used to treat schizophrenia and bipolar disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html

that Plaintiff's mental status examination was incongruent to his stated symptoms and that his reported auditory hallucinations appeared to be atypical in nature. (Tr. 409).

On May 28, 2009, Plaintiff saw Dr. Khanuja and reported that his mood was "somewhat down." However, his affect was full and appropriate and he was smiling. Lamictal was prescribed. (Tr. 410).

On July 30, 2009, Plaintiff again saw Dr. Khanuja, reported doing better on Lamictal and denied prolonged depressed mood. However, his mood was noted to be "depressed." (Tr. 411). His GAF was 65. It was noted that Plaintiff was "not following treatment recommendations (to wean off Klonopin)." (Tr. 411).

On December 8, 2009, Plaintiff presented at the emergency room with depression and psychosis. (Tr. 685). He was admitted to the mental health unit. (Tr. 695). He reported hearing voices and having hallucinations of friends who died a long time ago. He also reported anxiety, excessive handwashing, and wanting to wear his stocking cap because it helps to filter out the voices. (Tr. 686). One record from this hospital stay states that he had a three-year degree "in computer" from ITT Tech; however, another record states that he had no training beyond high school. (Tr. 687, 700). His drug screen was negative for benzodiazepine despite the fact that he had a Klonopin prescription and had stated that he was compliant with his medications. Plaintiff requested discharge two days after he was admitted, and his request was granted. At discharge, it was noted that his function level was "good," his condition was stable, he socialized excellently with other clients; there was no evidence of disorganized behavior, speech, or thought process; he was goal-oriented; and there was no evidence of internal stimulation. He made good eye contact; had normal gait, station, and behavior; and had spontaneous, clear, and coherent speech. His mood was described as fine, his affect was euthymic, and he had no

suicidal or homicidal ideation. He was alert and fully oriented. His insight was partially improved, and his judgment was improved. It was noted, "There are question marks regarding the reliability of this patient because malingering was suspected in his case." (Tr. 690). At discharge, his diagnosis was psychosis not otherwise specified, mood disorder not otherwise specified, rule out malingering for prescription and disability. His GAF at discharge was 50. (Tr. 689).

On February 3, 2010, Plaintiff saw Dr. John Wood, reporting problems with depression and anxiety. He reported that he had been recently hospitalized in a mental health unit and that he left after three days against medical advice. He stated that some of his problems seemed to be getting worse and that he had been experiencing auditory hallucinations for the last five months. He reported hearing two or three male voices. He reported that his sleep was ok as long as he took his trazodone. (Tr. 673).

On March 10, 2010, Plaintiff returned to Dr. Wood. He reported that he had been down, had been having crying spells, and was hearing voices. He asked about the possibility of changing his medications. (Tr. 674).

On January 21, 2010, Plaintiff again presented to the emergency room with depression and psychosis. (Tr. 704). He complained of hallucinations and suicidal ideation for three weeks. He reported being unable to afford the medications that he was prescribed after his prior hospitalization and stated that he had stopped taking them. (Tr. 707). Notes state that during his hospitalization, Plaintiff "remained constantly preoccupied with medications especially controlled substances." (Tr. 708). His GAF at admission was 35, and his GAF at discharge two days later was 45. (Tr. 705-07). His diagnoses at discharge included psychosis, not otherwise

specified; rule out schizoform disorder; rule out chronic paranoid schizophrenia; rule out malingering. (Tr. 707).

A June 15, 2010 MRI of the lumbar spine showed a "tiny right L5-S1 paracentral disc protrusion" that "does not cause canal stenosis or nerve root displacement," bilateral L3-L4 through L5-S1 foraminal stenosis, no significant central spinal canal stenosis, and lower lumbar facet hypertrophy. (Tr. 676).

### C. CONSULTATIVE EXAMINATIONS AND OPINION EVIDENCE

#### 1. EVIDENCE RELATED TO PLAINTIFF'S MENTAL IMPAIRMENTS

On July 10, 2007, Dr. John O. Wood, Psy.D., met with Plaintiff and completed a psychological evaluation, pursuant to a referral by the Division of Vocational Rehabilitation. (Tr. 555-59). Dr. Wood noted that he had previously seen Plaintiff in 2003 and 2004, and that he had reviewed those treatment records. Dr. Wood noted Plaintiff's history of depression, his feelings of hopelessness and worthlessness, and his problems falling asleep. (Tr. 555). Dr. Wood administered a mental status exam and found Plaintiff had a score of 29 out of 30, with a score of 23 or less suggesting a need for further assessment. Plaintiff had normal orientation, no difficulty with immediate recall, no abnormal mental trends involving delusions or hallucinations, no homicidal or suicidal ideations, and no problems with the language portion of the exam. He had some problems remembering words in a delayed recall task and had "a slowness of pace" on the "serial sevens" part of it. Dr. Wood diagnosed Major Depressive Disorder, Recurrent; Anxiety Disorder; and ADHD. He assigned a GAF score of 55 to 60. (Tr. 558). He concluded that Plaintiff's "problems with depression and anxiety, if properly managed, would not create a substantial impediment to his maintaining employment." (Tr. 559).

On August 29, 2007, James Spence, Ph.D., a nonexamining psychologist, completed a Psychiatric Review Technique form for Plaintiff. (Tr. 634-44). He found that Plaintiff's impairments of anxiety and bipolar disorder were nonsevere. (Tr. 634, 644). He found mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation of extended duration. (Tr. 642).

On August 29, 2008, Plaintiff was seen by Dr. Jonathan D. Rosenboom, Psy.D., a clinical psychologist, for a consultative examination. (Tr. 619). Plaintiff reported that due to his anxiety, if he goes into a crowded place, he can physically throw up. He reported numerous stressors in his life. He stated that he had been on numerous drugs for mental disorders and that his current prescriptions for trazodone and Klonopin had the best effect on his symptoms. (Tr. 620). He told Dr. Rosenboom that he last worked in December 2006 as a carpenter and that he quit working there because he got mad after his boss accused him of taking a screwdriver and "chewed [Plaintiff's] butt in front of others." Asked why he was not currently seeking employment, Plaintiff stated that it was because of his father's illness. Dr. Rosenboom observed that Plaintiff's mood during the interview was a mixture of dysphoria and anxiety, that his gross motor behavior was noted for restlessness due to his anxiety, and that his speech was soft and on occasion difficult to understand. (Tr. 621). His thoughts flowed evenly, logically, and in a goal-oriented manner, with no signs of a formal thought disorder. Plaintiff was pessimistic and despondent during the examination and complained of moderate loss of interest in activities he once enjoyed. He indicated that his depressive symptoms were "much more intense and problematic for him" than his anxiety symptoms were. Dr. Rosenboom assessed Major Depressive Disorder and Anxiety Disorder and assessed a GAF of 52. He opined that "the

applicant currently does not suffer from a mental disability which, in and of itself, prevents him from engaging in that employment or gainful activity for which his age, training, and education will fit him. (Tr. 622).

On December 10, 2008, Marsha Toll, Psy.D., a nonexamining psychologist, completed a Psychiatric Review Technique form for Plaintiff. (Tr. 656-66). She found that with prescription compliance, Plaintiff's mental impairment was stable and thus would be considered non-severe. (Tr. 666).

### 2. EVIDENCE RELATED TO PLAINTIFF'S PHYSICAL IMPAIRMENTS

On July 2, 2007, Chul Kim, M.D., saw Plaintiff for an internist examination, pursuant to a referral from the Missouri Department of Elementary and Secondary Education section of Disability Determinations. (Tr. 606-09). Plaintiff reported to Dr. Kim that he had a dull pain in his lower back at all times that went to his right hip, that he took pain pills and aspirin. (Tr. 606). Dr. Kim noted that Plaintiff had no significant swelling or deformity and was able to walk, squat, and get on and off the examining table without significant problems. (Tr. 608). His impression was chronic lower back pain with lumbar strain and bipolar disorder. (Tr. 609).

On September 6, 2007, Plaintiff was seen by Patrick J. LeCorps, M.D., at the request of the Department of Family Services. Plaintiff reported low back pain and irradiation of the pain to the right hip and right groin region. He stated that the pain was a 5 or 6 on a scale of 1 to 10 and that it was constant. On examination, Plaintiff had no leg length discrepancy and no pelvic tilt. Hyperextension of the lumbosacral spine was painful but normal. Lateral flexion on the right and left side was normal. The straight leg raising test was 90 degrees bilaterally. X-rays were generally normal. The impression was right lumbar myofascitis that should respond to nonsteroidal anti-inflammatory medications and muscle relaxers. (Tr. 632).

On December 3, 2008, Plaintiff was evaluated again by Dr. Kim, on referral from the Missouri Department of Disability Determinations. (Tr. 650-53). Plaintiff reported constant sharp pain in his right lower back and right groin and stated that pain pills gave him some relief. He stated that he could stand on his feet for 30 to 45 minutes, could walk two blocks without an assistive device, could sit for 20 minutes, and could lift about 30 pounds. He reported that he was sent to a pain medication clinic where he was offered an injection but could not afford it. He was also offered Dilaud to treat his pain, but he did not take it due to possible adverse reactions. (Tr. 650). He reported a headache in the back of his head most of the time. (T. 651). On physical examination, Dr. Kim observed some limitations in Plaintiff's range of motion on forward flexion, and he found that the straight leg raising was up to 70 degrees on the right side with pain in the right hip and right groin. Dr. Kim found that Plaintiff's gait was stable and that he could walk and get on and off the examining table without significant problem. (Tr. 652). He assessed chronic right lower back pain and right groin pain with right sacroiliac joint problem, mental problems including anxiety and bipolar disorder, obesity, chronic headache, and some sensory deficit in the left lower leg and foot. (Tr. 653).

On March 2, 2009, Plaintiff's treating physician, Dr. Plunkett, filled out a Medical Source Statement. (Tr. 669-71). He stated that Plaintiff could sit for one hour in an eight hour workday, could stand/walk for one hour in an 8 hour workday; could frequently reach, handle, and finger; could frequently lift 10 pounds, occasionally lift 20 pounds and rarely lift 50 pounds; could frequently carry 10 pounds, occasionally carry 20 pounds, and rarely carry 50 pounds; could frequently bend and reach above shoulder level, could rarely squat or stoop, and could never climb; was markedly affected by pain; and was moderately affected by fatigue. (Tr. 670-71).

### D. VOCATIONAL EVIDENCE

Vocational Expert Darrell Taylor testified at the hearing. (Tr. 77-87). The VE testified that Plaintiff's past work was as a construction worker (a heavy exertional and semi-skilled position) and as a worker on an air conditioning assembly line (light as Plaintiff performed it and semi-skilled). He testified that Plaintiff had acquired no transferable skills from those positions. The ALJ asked the VE to consider the following hypothetical:

> Assume a person, a younger individual between the ages of 40 and 44 years of age with a high school equivalent education and the past work experience you've identified. Further assume that individual is limited to the full range of light work. However, the postural were at occasional. They need to avoid concentrated exposure to vibration. And they needed to work in an environment with only occasional interaction with the public. Would such a person have been able to do past relevant work?

The VE answered that such a person could do Plaintiff's air conditioning assembly work as he performed it. (Tr. 79). He did not give a number of such jobs that would be available. The VE also testified that such a person could perform some other jobs in the regional and national economy, including "housekeeper, cleaners," Dictionary of Occupational Titles number 323.687-014 (7500 jobs in Missouri); and "hand packer positions, light unskilled," DOT No. 920.687-018 (9,000 jobs in Missouri). (Tr. 80-81). The ALJ then asked whether those jobs would change if the person was also limited to only occasional interaction with co-workers, and the VE testified that the numbers would remain the same. (Tr. 81-82). The VE also testified that if the individual were either off task or missed three or more days a month, those positions would be eliminated. (Tr. 84).

The ALJ then asked the VE to consider:

> a younger individual between 40 and 44 years of age with a high school equivalent education and the past work experience you've identified. And further assume that individual was limited to the full range of sedentary work. However,

their postural were at occasional. They would need to avoid concentrated exposure to vibration and they could only occasionally interact with the public and co-workers. Would there be any such jobs?

(Tr. 82). The VE responded that there would be about 1600 sedentary, unskilled hand packer jobs in Missouri (DOT 694.686-010); 600 production assembler jobs in Missouri (DOT No. 685.687-026; and 500 surveillance system monitor jobs in Missouri (DOT No. 379.367-010. (Tr. 82-83). The VE testified that those positions would still be available if the individual had to be able to stand for five minutes every hour, but not if the individual had to stand for ten minutes every hour. He also testified that if the individual had to leave the workstation and lie down to relieve pain more than twice in an average day, that would eliminate the positions. (Tr. 84).

## III.   DECISION OF THE ALJ

The ALJ issued a decision on September 24, 2010. (Tr. 9-20). He found that Plaintiff met the insured status requirements of the Act through March 31, 2008 and had not engaged in substantial gainful activity since February 15, 2007, the alleged onset date. The ALJ found that Plaintiff had the following severe impairments: lumbar disc bulge, and stenosis, major depressive disorder, bipolar disorder, and polysubstance abuse. (Tr. 11). He also found that Plaintiff did not have an impairment (or combination of impairments) that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12).

The ALJ then found that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b) involving occasional climbing, balancing, stooping, kneeling, crouching and crawling, no concentrated exposure to vibration, and occasional interaction with co-workers and the public. (Tr. 14). The ALJ found that Plaintiff could not perform his past relevant work; that he was a younger individual as of the disability onset date; that he had a high school education and could communicate in English; and

that he had acquired work skills from past relevant work. (Tr. 18). Relying on the testimony of a Vocational Expert, the ALJ found that there were jobs existing in significant numbers in the national economy Plaintiff could perform and that a finding of "not disabled" was appropriate. (Tr. 18-19). The ALJ concluded that Plaintiff had not been under a disability, as defined in the Act, from February 15, 2007, through the date of the ALJ's decision. (Tr. 19).

## IV. GENERAL LEGAL PRINCIPLES

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)). "Substantial evidence is 'less than preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits.  20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).  At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611.  At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611.  At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ

proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e). At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## V. <u>DISCUSSION</u>

The primary issues to be resolved are (A) whether the ALJ erred by failing to find that Plaintiff's anxiety was a severe impairment, and (B) whether the ALJ's RFC assessment included adequate limitations related to Plaintiff's mental and physical impairments.

**A.    THE ALJ'S FAILURE TO FIND THAT PLAINTIFF'S ANXIETY WAS A SEVERE IMPAIRMENT**

Plaintiff first argues that the ALJ erred at Step Two by failing to find that Plaintiff's anxiety was a severe impairment.

To show that an impairment is severe, a claimant must show that he has (1) a medically determinable impairment or combination of impairments, which (2) significantly limits his physical or mental ability to perform basic work activities, without regard to age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c); 404.1521(a), 416.920(a)(4)(ii), (c); 416.921(a). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). Basic work activities include, among other things, understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and unusual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b). Although the requirement of severity is not an "onerous requirement," it is "not a toothless standard." *Kirby*, 500 F.3d at 707.

Here, although Plaintiff did receive diagnoses of anxiety disorder and received some treatment for anxiety disorder, there is little evidence that his anxiety limited his ability to do basic work activities. Plaintiff's treatment notes contain very little detail regarding the effects of Plaintiff's anxiety; instead, they generally simply state that Plaintiff had anxiety and/or panic attacks. (Tr. 428, 509, 511-12). Plaintiff reported to consultative examiner Dr. Jonathan Rosenboom that his depressive symptoms were much more intense and problematic for him than his anxiety disorder. (Tr. 622). Although Plaintiff testified that his anxiety limits his ability to go to public places such as large stores, the ALJ pointed out that that testimony was contradicted

by his statements elsewhere in the record, such as his statement that his physical and mental conditions never affects his ability to do shopping or group activities. (Tr. 12-13, 57, 279). In addition, two nonexamining psychologists filled out Psychiatric Review Technique forms opining that Plaintiff's impairment of anxiety was nonsevere. (Tr. 634, 644, 666). Thus, the undersigned finds that the ALJ's decision not to include Plaintiff's anxiety among his severe impairments at Step Two was supported by substantial evidence.

Moreover, to the extent that the ALJ erred at Step Two with respect to Plaintiff's anxiety, the undersigned finds that error was harmless in this case. Courts frequently find that an ALJ's error at Step Two in failing to find a particular impairment severe does not require reversal where the ALJ considers all of a claimant's impairments, severe and non-severe, in his or her subsequent analysis. *See Spainhour v. Astrue*, No. 11-1056-SSA-CV-W-MJW, 2012 WL 5362232, at *3 (W.D. Mo. Oct. 30, 2012) ("[E]ven if the ALJ erred in not finding plaintiff's shoulder injury and depression to be severe impairments at step 2, such error was harmless because the ALJ clearly considered all of plaintiff's limitations severe and nonsevere in determining plaintiff's RFC."); *Givans v. Astrue*, No. 4:10-CV-417-CDP, 2012 WL 1060123, at *17 (E.D. Mo. March 29, 2012) (holding that even if the ALJ erred in failing to find one of the plaintiff's mental impairments to be severe, the error was harmless because the ALJ found other severe impairments and considered both those impairments and the plaintiff's non-severe impairments when determining Plaintiff's RFC). *See also* 20 C.F.R. §§ 404.1545(a)(2) , 416.945(a)(2) ("If you have more than one impairment. We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity.").

Here, the ALJ clearly considered all of Plaintiff's limitations, including his anxiety, in his analysis after Step Two. At Step Three, in determining whether Plaintiff had an impairment or combination of impairments that met or equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the ALJ discussed Plaintiff's testimony regarding his anxiety, including his statement that he is unable to go to the store because he becomes physically ill from being around other people, his statement that he does not leave the house to go shopping or participate in school functions, and his statement that he is unable to handle stress or change. (Tr. 12-13). The ALJ considered these assertions in combination with the other evidence in the record and found that Plaintiff had only mild restrictions in the activities of daily living, mild impairments in the area of social functioning, and moderate difficulties in the ability to maintain concentration, persistence, or pace.

The ALJ also considered Plaintiff's anxiety in determining Plaintiff's RFC. (Tr. 14-18). He specifically discussed Plaintiff's testimony regarding his panic attacks and anxiety, his history of treatment for mental impairments, and his medications for mental impairments (including Klonopin, which Plaintiff took for anxiety). (Tr. 14-17).

In sum, the undersigned finds that to the extent that the ALJ erred in failing to find Plaintiff's anxiety a severe impairment, the error was harmless because the ALJ proceeded with the analysis and considered all of Plaintiff's impairments, including anxiety, throughout his analysis. *See Givans*, 2012 WL 1060123, at *17.

### B. RFC ASSESSMENT

Plaintiff's second argument is that the ALJ did not adequately take into account Plaintiff's mental and physical limitations in determining his RFC.

A claimant's RFC is "the most a claimant can do despite [the claimant's] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). In his RFC assessment, the ALJ found that Plaintiff had the RFC to perform light work involving occasional climbing, balancing, stooping, kneeling, crouching, and crawling, with no concentrated exposure to vibration and only occasional interaction with co-workers and the public. Plaintiff challenges both the mental and physical components of the RFC finding.

### 1. MENTAL RFC ASSESSMENT

Plaintiff first asserts that in determining that Plaintiff's only mental limitation was that he could have only occasional interaction with the co-workers and the general public, the ALJ failed to adequately consider several pieces of evidence, including Plaintiff's reported symptoms of anxiety and depression and observations of his anxious or dysphoric moods (Tr. 613, 619, 685, 692, 703); Plaintiff's reports that he feels physically sick when he experiences change or is forced to interact in large group settings (Tr. 620); Plaintiff's reported feelings of hopelessness and worthlessness (Tr. 555); and Plaintiff's reports of back pain and associated limitations (Tr. 431, 434, 435, 574, 590-96, 651). The undersigned disagrees.

First, contrary to Plaintiff's argument, the ALJ did not fail to consider this evidence. The ALJ specifically discussed and considered Plaintiff's diagnoses of anxiety and depressive disorder (Tr. 11); Plaintiff's testimony that he suffers from panic attacks and anxiety disorder, to the point that he is unable to enter public places without becoming physically ill (Tr. 12, 14);

Plaintiff's allegations that he suffers from depression (Tr. 15); Plaintiff's history of treatment with his general practitioner for mental impairments (Tr. 15); Plaintiff's history of counseling with psychologist John Wood, Psy.D. (Tr. 15); Plaintiff's hospitalizations for mental impairments (Tr. 15); and Plaintiff's history of medications and changes in medications for his mental impairments. (Tr. 16).

Second, in evaluating this evidence, much of which depended on Plaintiff's subjective complaints regarding his mood and mental state, the ALJ conducted a proper credibility analysis. When evaluating the credibility of a plaintiff's subjective complaints, the ALJ must consider several factors: "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of [the subjective complaints]; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984)). *See also* 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (discussing factors to be considered in determining the severity of pain or other symptoms). The court "will defer to the ALJ's credibility finding if the ALJ 'explicitly discredits a claimant's testimony and gives a good reason for doing so.'" *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010)).

The ALJ's analysis of Plaintiff's complaints was consistent with the framework set forth above. The ALJ cited 20 C.F.R. §§ 404.1529 and 416.929, and he reviewed the evidence as a whole, discussing the factors most relevant to this case. The ALJ discussed Plaintiff's testimony regarding his daily activities, including inconsistencies between Plaintiff's testimony and

Plaintiff's statements to others regarding his ability to do housework, shop, and participate in group activities (Tr. 12-14, 56-58, 251, 279, 621); Plaintiff's sporadic work history prior to his disability onset date (Tr. 17); the fact that Plaintiff indicated to a psychologist that he was not seeking employment due to his father's illness, suggesting that he was not working for reasons other than his allegedly disabling impairments (Tr. 17, 621); the fact that Plaintiff had been able to return to full-time employment following previous denials of disability benefits (Tr. 17); the absence of work restrictions from Plaintiff's psychologists and physicians (Tr. 17); and evidence that Plaintiff's medications for mental illness had been effective in controlling Plaintiff's symptoms and that there had been little fluctuation in his dosage (Tr. 15-16, 509, 512).

The ALJ considered several other relevant factors as well. First, he considered the fact that some of Plaintiff's treating doctors had indicated that Plaintiff was engaging in possible malingering. (Tr. 17, 408, 690, 707). *See Clay v. Barnhart*, 417 F.3d 922, 930 & n.2 (8th Cir. 2005) (noting that psychologists' findings that a plaintiff was malingering cast suspicion on plaintiff's credibility); *Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010) (finding it proper for the ALJ to consider a doctor's suggestion that a plaintiff was exaggerating her symptoms in assessing the credibility of those symptoms).

Second, he properly considered evidence that Plaintiff did not consistently take his prescribed medications. (Tr. 15, 690). *See Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001) (holding that a lack of compliance with treatment recommendations is a proper factor in the credibility analysis).

Third, he properly considered inconsistencies in the Plaintiff's own statements regarding his education level as a factor that weighed against Plaintiff's credibility. (Tr. 17, 687, 700). *See Rogers v. Astrue*, 479 F. App'x 22, 23 (8th Cir. 2012) (affirming the ALJ's decision and noting

that the ALJ had discounted the plaintiff's credibility based on inconsistent statements the plaintiff had made); *Ply v. Massanari*, 251 F.3d 777, 779 (8th Cir. 2001) (noting that inconsistencies in the plaintiff's statements were a factor for the ALJ to consider in assessing the plaintiff's credibility).

Plaintiff does not contest the ALJ's credibility determination or suggest that the above factors were improperly considered or unsupported by the evidence. Therefore, the undersigned will defer to the ALJ's determination that Plaintiff's subjective complaints were not fully credible.

Plaintiff further argues that that the ALJ did not adequately consider the delayed recall difficulties and slowness of pace Plaintiff showed during his evaluation with Dr. Wood. However, "an ALJ is not required to discuss every piece of evidence submitted," and "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998). Although the ALJ did not expressly discuss Dr. Wood's finding that Plaintiff had some problems remembering words in a delayed recall task and had a "slowness of pace" on another part of Dr. Wood's examination, it is clear that the ALJ did consider Dr. Wood's opinion. The ALJ expressly quoted from and discussed Dr. Wood's opinion that Plaintiff's problems with depression and anxiety, if properly managed, would not create a substantial impediment to his maintaining employment. (Tr. 17). Where, as here, an ALJ makes specific references to some findings in a physician's report, it is likely that the ALJ considered the physician's other statements and rejected them. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) ("Given the ALJ's specific references to findings set forth in Dr. Michaelson's notes, we find it 'highly unlikely that the ALJ did not consider and reject' [the physician's] statement that [the claimant] was markedly limited."). Moreover, other statements

in Dr. Wood's report are consistent with the ALJ's finding that Plaintiff was not disabled. For example, Dr. Wood found that Plaintiff had a score of 29 out of 30 on a specific mental status examination on which a score of 23 or less suggested a need for further assessment. (Tr. 558). He also found that Plaintiff had no difficulty with immediate recall. (Tr. 558).

Plaintiff also argues that the ALJ failed to consider Dr. Plunkett's assessment that Plaintiff would not be capable of complex or detailed work because of his marked affects in functioning from his pain levels. Again, although the ALJ did not expressly discuss that statement, he did discuss and quote from other portions of Dr. Plunkett's report, so he likely considered the entire report. (Tr. 17-18). In addition, as discussed below, the ALJ conducted a proper credibility analysis and did not find Plaintiff's complaints of pain fully credible; thus, he likely found Dr. Plunkett's assessment of the effects of that pain not fully credible.

The undersigned further notes that the fairly minimal mental limitations in the RFC assessed by the ALJ were supported by the opinion of treating and examining psychologist John Wood, Psy.D., who stated that "[Plaintiff's] problems with depression and anxiety, if properly managed, would not create a substantial impediment to his maintaining employment," as well as the opinion of examining psychologist Jonathan Rosenboom, Psy.D., that "[Plaintiff] currently does not suffer from a mental disability which, in and of itself, prevents him from engaging in that employment or gainful activity for which his age, training, experience, and education will fit him." (Tr. 17, 559, 622).

In sum, the undersigned finds that the ALJ properly considered the evidence related to Plaintiff's mental limitations and that his mental RFC was supported by substantial evidence.

## 2. PHYSICAL RFC ASSESSMENT

Plaintiff argues that in finding Plaintiff capable of light work,[13] the ALJ failed to consider Plaintiff's consistent reports of back pain and evidence of his degenerative disc disease with foraminal stenosis. The undersigned disagrees and finds that the ALJ's finding regarding Plaintiff's physical RFC was supported by substantial evidence.

First, the ALJ did consider Plaintiff's consistent reports of back pain. He noted that "the claimant does routinely report symptoms of chronic pain to his providers and receives the appropriate medications for his condition." (Tr. 16). However, the ALJ analyzed the record as a whole and found that Plaintiff's complaints of pain were only partially credible. (Tr. 16). In addition to the credibility factors mentioned above, the ALJ properly considered the lack of objective medical evidence supporting Plaintiff's complaints, along with the fact that Plaintiff has not sought routine treatment from an orthopedic specialist or pain specialist and had not been offered surgery. (Tr. 16).

The ALJ's RFC finding was also supported by the report of consultative examiner Chul Kim, M.D., indicating that Plaintiff was able to walk, squat, and get on and off of the examining table without problems, as well as Dr. Kim's opinion that Plaintiff could stand for 30 to 45 minutes, walk two blocks, sit for 20 minutes, and lift up to 30 pounds. (Tr. 18, 608, 650, 652). The ALJ also considered and gave "some weight" to the opinion of Plaintiff's treating physician,

---

[13] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.967(b).

Dr. Plunkett, that Plaintiff could lift and carry 10 pounds frequently, 20 pounds occasionally, and could bend frequently, squat and stoop rarely, and never climb. (Tr. 18, 670-71).

In sum, the undersigned finds that the RFC assessed by the ALJ was supported by substantial evidence with respect to both Plaintiff's physical and mental impairments.

## VI.     CONCLUSION

For the reasons set forth above, the undersigned finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 13th day of February, 2013